### THE CHARLTON HALL.

(District Court, S. D. New York. July 11, 1922.)

1. **Shipping ⬅132(3)—Carrier has burden to show cause of damage to cargo during voyage.**

   Where cargo, received in good condition when delivered, was damaged by salt water and oil, the ship has the burden of proof to show that the damage was due to perils of the sea or other cause for which it was not responsible under the bills of lading.

2. **Shipping ⬅121 (1)—Ship assumes risk of inadequate inspection before voyage.**

   A vessel, which relies on external appearance that she was in proper condition for stowage of cargo, in lieu of tests, takes the risk of showing that the inspection and examination was diligently made.

3. **Shipping ⬅121 (1), 123—Ship held liable for damage to cargo.**

   Ship *held* liable for damage to shipments of malt from seawater and oil, for inadequate inspection of the pipes from which the water leaked and for improperly stowing the malt in the same cargo space with drums of kerosene oil.

4. **Shipping ⬅141 (3)—Scope of exemption of liability for cargo damage from "perils of the sea."**

   To bring herself within an exemption of liability for damage to cargo from "perils of the sea," the ship must show that such perils were extraor-

dinary and such as could not have been anticipated at the season and could not have been guarded against by skill and care.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

In Admiralty. Suit by the Brazilian Mercantile Company, Inc., against the steamship Charlton Hall. Decree for libelant.

Baldwin & Curtis, of New York City, for libelant.

Bigham, Englar & Jones, of New York City, for respondent.

HAZEL, District Judge. On February 15, 1917, the libelant shipped on the steamer Charlton Hall 2,000 bags of malt in good order (comprising two shipments of 1,000 bags each), and conditioned for delivery in like condition at Rio de Janeiro. On arrival of the malt at the port of delivery it was in a damaged condition, quantities having come in contact en route with kerosene oil and other quantities with salt water in the hold. The steamship carried a general cargo of merchandise in addition to the malt, including fuel and lubricating oil in drums, which was stowed between deck in No. 3 hold. During the trip the vessel encountered heavy weather, which continued for two days; the wind at times blowing at the rate of 60 miles an hour. She returned to Pernambuco, after passing that port, to make necessary repairs to her engine and condenser, though they are not shown to have been made necessary because of the severe weather, which strained the vessel and not improbably resulted in cracking the water pipe with the result that the quantity of malt stowed in the shelter deck was wetted by salt water and the quantity stowed between deck injured by oil from leakage in the drums.

[1] It is contended that claimant is relieved of liability by the provisions of the Harter Act (Comp. St. §§ 8029–8035), and by reason of the condition in the bill of lading which permitted the vessel to carry general merchandise, kerosene oil, petroleum, etc., in cases, barrels, or packages. The showing that the malt was in good condition when loaded, and quantities wetted with salt water, and other quantities permeated with kerosene oil from the drums at the time of delivery established a prima facie case of negligence against the carrier under the bill of lading, and it became the duty of the latter to show that the damage thereto in fact was occasioned by perils of the sea, or by perils for which it was not responsible. The Folmina, 212 U. S. 354, 29 Sup. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748; The Lockport (D. C.) 197 Fed. 213. This presumption of negligence I find has not been overcome by claimant. It is not seriously contended that the vessel was generally unseaworthy, save in so far as there existed negligence on her part in failing to properly inspect and examine the water pipes extending through the cargo space where malt was stowed, and which, on arrival of the steamer, disclosed a fracture from which the water evidently dripped. The inspection made of the pipes leading to the refrigerator before the voyage began appears to have been for the most part visual only; no adequate tests being made by tapping of the hammer or by other known methods. Some pressure was put upon the pipes, but the mate was unable to testify that the results were wholly satisfactory.

285 F.—41

[2, 3] The rule is that a vessel, which relies on external appearance that she was in proper condition for stowage of cargo in lieu of tests, takes the risk of showing that the inspection and examination was diligently made. The Rappahannock, 184 Fed. 291, 107 C. C. A. 74. In this particular the vessel failed to exercise ordinary care in the protection of the malt stowed near the pipe, since mere visual inspection of the pipes in the shelter deck, indicating that that part of the hold was dry and fit for stowage, was insufficient, considering the character of the cargo. She must also be held at fault in improperly stowing quantities of malt in the same cargo space with drums of kerosene oil, for this subjected the malt to injury from leakage of the drums in case of disarrangement, or leakage of the drums due to the vessel straining from severe weather conditions, which was likely to occur at the time of transportation.

[4] Although the weather is shown to have been stormy, and the vessel rolled considerably during the voyage, yet this was not unanticipated in the month of February. There was no extraordinary test of her seaworthiness, though admittedly she was strained. The Rappahannock, 184 Fed. 291, 107 C. C. A. 74. In The Rosalia, 264 Fed. 285, Judge Hough, writing for the Circuit Court of Appeals, said that peril of the sea "which forms a good exception in a bill of lading means something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety." The evidence relating to weather did not show it to have been of such severity as to warrant holding that the carrying ship was relieved from liability by the exception in the bill of lading under this rule.

Importance is attached by claimant to The Exe, 57 Fed. 399, 6 C. C. A. 410, where a stanchion gave way to the pressure of a light cargo, when prior thereto it had resisted the pressure of heavier cargo. In that case, however, it appeared that a screw bolt holding the stanchion in place was broken in two, while another was loose, and the tea boxes around the stanchion were battered and damaged. The voyage lasted three months, and the log showed rolling and pitching, and shipping of water on deck fore and aft, on various occasions during the long voyage. In the present case neither the deck log nor the engine room log was produced, and the first mate, testifying to the severity of the storm, refreshed his recollection in relation thereto from a protest made after the steamship returned to New York. Moreover, the ship was not damaged in consequence of the gale, and the cargo does not appear to have been shifted. Inasmuch as the gale was not sufficiently severe to have proximately caused the damage, it is quite believable that the stowage of the malt was improper and faulty. In 36 Cyc. pp. 251, 252, the rule is stated as follows:

"Different parts of the cargo must be stowed so as not unnecessarily to injure one another; * * * and where the vessel carried different kinds of cargo, which are liable to damage each other, special care must be taken that they be so stowed that damage shall not result."

This rule I think applies to the facts which we are here considering. It is true that machinery was placed in No. 3 hold between the malt

stowed and the oil drums; but the leak was from the bung, and found its way to the malt. The claimant in my opinion was not relieved from its negligent stowage under the bill of lading, and no condition thereof relieved the steamship from liability.

A decree may be entered for libelant, with costs.