## THE CYPRIA.

### ORE S. S. CORPORATION v. THE CYPRIA et al. and five other cases.

District Court, S. D. New York.

July 7, 1942.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Alfred Ogden, both of New York City, of counsel), for libellant Ore S. S. Corporation and others.

Hill, Rivkins & Middleton, of New York City (Robert E. Hill and Eugene P. Mc-Cue, both of New York City, of counsel), for libelant R. Masso & Cia. and others.

Burlingham, Veeder, Clark & Hupper, of New York City (Burton H. White, of New York City, of counsel), for respondent Societe Mediterraneene D'Entreprises Tanger.

Haight, Griffin, Deming & Gardner, of New York City (Wharton Poor and J. Ward O'Neill, both of New York City, of counsel), for Norwegian Shipping & Trade Mission, Claimant, and others.

Bailey & Muller, of New York City (William H. Woolley, of New York City, of counsel), for libelant Sociedad Artistisa Ltda.

GODDARD, District Judge.

The several libelants sue to recover for sea water damage to their various cargoes shipped on M/V Cypria during a voyage from Philadelphia, Baltimore and New York to Spanish and Portuguese ports ending at Lisbon, on March 27, 1940.

Respondent, Societe Mediterraneene D'Entreprises Tanger, the charterer of the Cypria, has been sued on bills of lading and has impleaded the owners of the vessel. The Carriage of Goods By Sea Act, 46 U.S.C.A. § 1300 et seq., was incorporated by reference in all of the libelants' bills of lading. For the purpose of trial, the libels have been consolidated. The legal status of the various parties; the right of the libelants to file suits; the receipt of the cargo in apparent good order upon shipment; that it sustained damage through contact with sea water while on board the Cypria as a result of sea water entering the Nos. 2 and 3 holds through an open rivet hole in the ship's plating at the after starboard side of No. 3 hold, have been stipulated.

The Cypria, after a voyage to South America, arrived in New York on January 24, 1940. The following day she sailed for Philadelphia; then on to Baltimore; thence returning to New York, the cargo of the various libelants being taken on board at these ports and stowed in lower Nos. 2 and 3 holds. On February 8th, after taking on additional cargo at New York, she sailed from there to Horta, Azores Islands. When about three days out she encountered heavy wind and seas which lasted for several days and water entered holds Nos. 2 and 3. The water was pumped out and upon her arrival at Horta an examination of her bottom disclosed that a rivet was missing in the shell plating in the starboard bilge of No. 3 hold through which the water had entered.

Claimant's defense is that due diligence was exercised to make the Cypria seaworthy; that she was in fact seaworthy and that the damage resulted from causes from which the carrier is excused from liability under the Carriage of Goods By Sea Act, 46 U.S.C.A. § 1304(2) (c); more particularly as a result of a peril of the sea. Libelants' contention is that heavy weather could not have caused the loss of a sound rivet in the position where the rivet in question was located, and that the vessel was unseaworthy when the cargo was loaded; that the rivet was damaged either when the Cypria came in contact with ice or when she struck the gate of the dry-dock when she was previously in Marseilles.

Respondent, Societe Mediterraneene D'Entreprises Tanger, which issued bills of lading as charterer to certain of the libelants, also sets up the defense that under the provisions of the Carriage of Goods By Sea Act, there is no liability to the libelants and that if it be liable, it is entitled to indemnity from the vessel and her owners. The vessel owner contends that if the charterer is held liable, it is not entitled to indemnity from the owner. Both the vessel and her charterer set up as a further defense that the libel of Conserveira Portuguese Ltda. et al. should be dismissed for failure to bring suit within the one year period prescribed by the Carriage of Goods By Sea Act.

Concededly, the water which damaged the cargo of the libelants entered through the open rivet hole in the starboard bilge of No. 3 hold.

■ If the carrier—a common carrier —shows that the loss resulted from perils of the sea, the carrier and the ship are exempt from liability under the Carriage of Goods By Sea Act, 46 U.S.C.A. § 1304, subsection (2) (c). The Aakre, D.C., 31 F.Supp. 8; Scrutton on Charter Parties and Bills of Lading, 14 Ed. p. 496; Cf. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, at page 107, 62 S.Ct. 156. If the loss resulted from the unseaworthiness of the Cypria, the carrier and the ship are liable for the damage unless it is shown that there was no want of due diligence on their part to make her seaworthy. Carriage of Goods By Sea Act, Section 1300 et seq. The Toledo, D. C., 30 F.Supp. 93, affirmed, 2 Cir., 122 F.2d 255, certiorari denied November 24, 1941, Isbrandtsen-Moller Co., Inc., v. The Toledo, 314 U.S. 689, 62 S.Ct. 302, 86 L.Ed. ——; Mente & Co. v. Isthmian S. S. Co., D.C., 36 F.Supp. 278, affirmed The Quarrington Court, 2 Cir., 122 F.2d 266.

For the first three days after leaving New York the Cypria encountered the usual weather expected in the North Atlantic in February and the bilges were sounded regularly and there was no leakage. From February 11th until February 15th the heavy weather and seas sweeping over the deck made it impossible to sound them. During this period the wind ranged between force 8 and 10 on the Beaufort Scale and a sea force ranging between 6 and 8 on the Norwegian Scale, which is next to the highest ‘on that scale. The Cypria's course was due East and the wind from the West. The log entries are not attacked and are

February 12—"At 10 A.M. dead slow speed. Much water on deck and some water had penetrated into the cabins and in provision room. Two port holes on the boat deck knocked in. Lifeboat in after deck somewhat damaged."

February 13—"Running before the weather at slow speed. Ship laboring heavily and shipping large quantities of water amidships; hull and steering gear heavily strained."

On the 14th the wind and sea moderated and the Cypria, which had been running at only enough speed to maintain steerage way, increased to full speed. These conditions continued with some moderation until February 15th, when the bilges were again sounded and it was found ‘that there was ten feet of water in holds Nos. 2 and

3 which was pumped out. Upon arrival at Horta on February 20th a diver made an inspection of that part of her bottom and found an open rivet hole in the starboard bilge of No. 3 hold inboard of the angle iron fitting the starboard bilge keel to the hull of the vessel through which the water had entered, which would be about twenty-two feet below her water line, as she was loaded, and reported that he found "no other defect in the shell plating in the area examined likely to cause any leakage". After a tap-screw bolt had been fitted into the open rivet hole, the surveyors for the Norwegian Veritas issued a certificate of seaworthiness that the Cypria was able to proceed to her discharging ports and recommended "examination of ship's bottom on available opportunity". The Cypria proceeded to Lisbon where she arrived on February 25, and after discharging cargo there she went on to Leixoes, Balboa, Santander, Seville; thence back to Lisbon, where she arrived on March 27th and was drydocked on March 29th. While on her way from Santander to Seville and Lisbon she again met heavy weather in the Bay of Biscay and as she was then light, she pounded heavily. When examined at Lisbon drydock it was found that the point of a rivet adjacent to the lost rivet hole was broken off and the surveyor for the Norwegian Veritas reported:

"A large number of rivets more or less slack from stem to about middle of No. 2 hold tanks port and starboard specially on the keel from fore-peak water tight bulkhead to 8 frames aft of said bulkhead. * * *

"Under No. 2 port tank found 3 rivets broken and leaky. Port and Starboard forward section of bilge keel bent.

"All blades on both propellers had edges bent".

The lower bridge corner angle bar stanchions were bent and required straightening and No. 3 hatch port and starboard after end corners required electric welding.

■ Wind force of 8 to 10 on the Beaufort Scale accompanied by seas of the force 6–8 on the Norwegian Scale are not extraordinary in winter crossings of the Atlantic. It was not a storm of such extreme violence as to be classified as a peril of the sea. The Rosalia, 2 Cir., 264 F. 285; The Edith, 2 Cir., 10 F.2d 684; The Emilia, D.C., 13 F.Supp. 7. It was a severe storm, but nothing "catastrophic" or extreme about

it. The Cypria was not subjected to heavy battering in abnormal wind and sea. Aside from some minor damage on deck, there was no damage except to rivets which were too weak to stand the strain. I do not think that the fact that the water entered her hold can be attributed to a peril of the sea. The water came in because the rivet gave way. Granting that the Cypria's plates were subjected to strain in the rough seas, this does not explain why it affected this one rivet submerged some twenty-two feet and located at the turn of the bilge. That this rivet gave way under the conditions which it did, indicates quite clearly that it was not up to standard. Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012. The fact that this rivet had caused no trouble up to this time does not indicate that it was found, but merely that its weakness had not been discovered. The Cypria was not reasonably fit to carry the cargo which she had undertaken to transport and therefore was not seaworthy. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241.

The next question is whether respondents have shown that there was no want of due diligence on their part to make the Cypria seaworthy. The Cypria was built in Copenhagen in 1931, according to the specifications of the Norwegian Veritas and received its highest classification which she has since retained. Early in July, 1939, the Cypria was surveyed while in drydock at Marseilles, and after some collision and voyage repairs had been made, she retained her classification in Norwegian Veritas. While a certificate of classification is entitled to weight, proof of the actual condition of a ship carries greater weight. The Marine Surveyor who conducted the survey for Norwegian Veritas, has since died but it is stipulated that he "may be deemed to have testified * * * that while the vessel was on drydock there in the course of his survey after the bottom had been cleaned and scraped, he made a visual examination of the ship's plating including the riveting, looking up from the outside and looking down into the bilges from the inside after the limberboards had been removed, and after such repairs as he had recommended had been carried out, he saw nothing wrong with the plating and riveting".

 A visual examination of the character described would not be likely to disclose the condition of each rivet. No hammer or other specific test was made of the rivets, nor is there proof that any such test had been made during the entire period between the time she was built and the voyage in question. There is no convincing evidence that this rivet was in sound condition when the Cypria sailed from New York to Europe or that a reasonably careful examination would not have disclosed that it was defective. Due diligence requires that inspections of a vessel's plates and rivets should be often enough and of such a character as to make reasonably sure that they are in condition to transport the cargo without damage, except from inevitable dangers. The shipper is entitled to this. If the vessel owner fails in this duty it and not the cargo owner assumes the risk of damage. I do not think that the respondents can be excused on the ground that due diligence was used to make her seaworthy. Unterweser Reederei Aktiengesellschaft v. Potash Importing Corp. (The Gonzenheim), 5 Cir., 36 F.2d 869; The Elkton, 2 Cir., 49 F.2d 700; The Citta di Palermo, 2 Cir., 226 F. 529; Warner Sugar Refining Co. v. Munson S.S. Line, D.C., 23 F.2d 194, affirmed, 2 Cir., 32 F.2d 1021; The Phoenicia, D.C., 90 F. 116.

On the Cypria's voyage to Philadelphia, previous to her sailing from New York, she encountered hard thick ice in the Delaware Bay and River. The ice was so thick that at times it brought her to a standstill causing heavy vibrations. Her propeller blades were bent by contact with large ice cakes. It is quite true that the blades are near the surface and the rivet, which caused the trouble, was some twelve feet below the water line, and ice generally floats. But it is quite possible, as libelants urge, that as she forced herself over the ice, a cake might have been forced along her bottom in such a manner as to loosen the rivet, but the facts are not sufficient to support a finding that this did or did not happen. Her Chief Engineer, after he saw the Cypria in drydock at Lisbon, said that he thought that the bilge keels and rivets in the forward end of the vessel might have been damaged through contact with the ice.

Whatever the damage may have been, the respondents' investigation consisted of having the ship's carpenter examine the rose boxes in the bilges to see if they were clean, and who reported that he saw nothing wrong. Here again the respondents, in not making a more thorough examination of the plates and rivets, assumed the risk of damage to cargo. The City of Pittsburgh,

1934 A.M.C. 1256; Warner Sugar Refining Co. v. Munson S.S. Line, supra.

The suggestion that this rivet was damaged when she came in contact with the dock gate in leaving the drydock at Marseilles in July, 1939, may be eliminated for the testimony is that it was the forward end of the *port* bilge keel which came in slight contact with the dock gate and bent the forward end of the port bilge keel for about two feet. There is no reasonable inference that this rivet was damaged at that time.

 The contention of the claimant and of the respondent charterer that the libel of "Conserveira Portuguese Ltda. et al" should be dismissed for failure to bring suit within the one year period prescribed by the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(6), is overruled. The cargo in question was discharged at Leixoes on March 7, 1940. The libel was filed on March 5, 1941, although process was not issued until later; but in admiralty suit is commenced when the libel is filed. Laidlaw v. Oregon Ry. & Nav. Co., 9 Cir., 81 F. 876; Leveille v. Eastern Steamship Lines, Inc., D.C., 12 F.2d 486; United States v. Burns Bros., Inc., D.C., 1 F.Supp. 219; Benedict on Admiralty, 6th Ed. Section 276.

At the time of the transportation involved in this suit the Cypria was under charter to the respondent under a written charter party which warranted: Art. (I) "The vessel, being tight, staunch and strong and in every way fitted for the usual cargo service and be maintained in the same state of class by the owners during the entire duration of the charter with a full complement of officers, seamen, engineers, firemen, galley, cabin and victualling staff required by a vessel of such class."

 It is urged by claimant that the rights of the charterer should be determined by reference to the law of Great Britain. It is true that the charter was headed with the London address of the brokers who negotiated it, but it does not appear where it was actually signed. It is between the Norwegian owner of a Norwegian vessel and a Moroccan charterer and provides for the delivery of the Cypria at Marseilles, France, and for redelivery at a Mediterranean port. The Cypria was at the times here involved trading between American ports and Spanish and Portuguese ports. The cargo was to be carried from the United States to Spain and Portu-

gal. American bills of lading issued for the cargo were signed "for the Master" and these bills of lading incorporated the American Carriage of Goods by Sea Act. In view of the circumstances, resort to British Law is not necessary. London Assurance v. Companhia de Moagens do Barreiro, 167 U.S. 149, 17 S.Ct. 785, 42 L.Ed. 113; United States-Alaska Packing Co. v. Luketa, 9 Cir., 58 F.2d 944; The Pehr Ugland, D.C., 271 F. 340; American Law Institute Restatement of Law, Conflict of Laws §§ 358, 361.

Libelants may have a decree for their damages and costs, which shall provide that the liability is primarily that of the vessel owners and that the owners shall indemnify respondent, Societe Mediterraneene D'Entreprises Tanger, the charterer.

A Commissioner will be appointed to ascertain the amount of damages.